ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2015-Dec-10  14:27:16
60CV-15-6127
C06D12 : 7 Pages

IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
_____DIVISION

MARGARET R. TRAMMELL,
ET.UX.                                                      PLAINTIFFS

v.                              NO. _____

M & T BANK CORPORATON                      DEFENDANT

HUDSON CITY SAVINGS BANK, AND
CITIMORTGAGE, INC.                          NECESSARY PARTIES


**PETITION FOR DECLARATORY JUDGMENT OF ACCEPTANCE
BY WAIVER, DISGORGEMENT OF AMOUNTS CONSTITUTING A SET OFF
FOR CLAIMS OF ARREAGE OR DEFICIENCY, FOR JUDGMENT
BY ESTOPPEL UPON PUBLIC POLICY, AND
FOR DECLARATION OF ACCORD AND SATISFACTION,
BY PLAINTIFFS' PERFORMANCE**


Plaintiffs for their cause of action, state:

1.      Plaintiffs, Margaret Renee and Robert Trammell, are residents of Pulaski County,

Arkansas.

2.      Defendant, M & T Bank Corporation, is a New York banking company which is the

assignee of a contract with plaintiffs, now owned as part of the acquisition of Hudson City Savings

Bank, of Paramus, New Jersey. Defendant, "Hudson," and CitiMortgage, Inc. all conduct business

in the state. CitiMortgage was the agent of Hudson, and is so now for M & T. The matter herein

involves real property equitable and legal rights on land located in this county ("the property").

3.      This Court has subject matter jurisdiction of this action and personal jurisdiction.


1

Factual Background

4.      Plaintiffs entered into the documents on the 6.5 acre parcel in Pulaski County described in Exhibits A and B, and received by defendant via assignment and transfer from Hudson, evidenced by Exhibit C.

5.      A significant disease prompted plaintiffs in January, 2014, to contact defendant CitiMortgage.  It was the agent for Hudson in all respects and now for the defendant, under a "servicing agreement" with both Hudson and defendant. (Exh. C).  Plaintiff sought CitiMortgage's loss mitigation assistance program related to a permanent loss of income and earning capacity.  CitiMortgage forms were delivered to its underwriter on February 6th.  After a third party "drive by" assessment of value, a valid appraisal was ignored and plaintiffs were denied.

6.      CitiMortgage then cooperated with a Realtor locally for a "HAFA" short sale.  Defendant's predecessor Hudson rejected without counteroffer an unconditional cash offer to purchase the property in an unconditional short sale, offered by an arm's length third party for a sum equal to the appraised value.

7.      Plaintiffs were then instructed in July, 2014, by CitiMortgage that a Deed in Lieu (DIL) process was initiated.  CitiMortgage imposed conditions that it "inspect, change locks, and secure the property," preceded by plaintiffs totally vacating and relinquishing control of the residence to CitiMortgage.  Defendant's assignor Hudson through its agent CitiMortgage took complete possession of the property, an inspections was performed by them, and special locks were installed by the property-preservation division of CitiMortgage.   Finally, Plaintiffs were ordered to stop any effort at marketing the property, or otherwise attempt to mitigate the situation.

2

8. Though the DIL requirements of CitiMortgage were final and rigid, plaintiffs accepted those actions as necessary conditions, and waited for notice to execute the DIL documents delivering title. Plaintiffs were later informed that Hudson and CitiMortgage were engaged in a dispute between themselves, over their respective duties, responsibilities, and liabilities under the terms of a "servicing agreement" in force between them. It is now known that Hudson was undergoing a sale of its assets to defendant. Only Hudson personnel had the loan workout authority, while CitiMortgage performed bureaucratic administration of the DIL. CitiMortgage staff finally became candid that they were unfamiliar with Hudson as a "private investor" and its procedures, and did not know why there was no progress. Plaintiffs were even encouraged to contact Hudson directly. They did in December, 2014, and were ignored, in conflict with Federal regulations, implied duties in a contract, and good faith business practices.

9. A. Hudson's silence continued till now, until plaintiffs received notice from defendant that it had acquired Hudson. All the while, CitiMortgage continually requested updated financials, one duplicate on top of the last, using familiar phrases that the process was continuing and near an end, and otherwise acting as if the loan was being handled in a routine fashion with good faith and fair dealing. Every conversation is allegedly recorded and preserved.

B. CitiMortgage and Hudson never disclosed there was unrelated collateral reasons the process had stopped. Plaintiffs were never offered repossession of the property, or permitted to mitigate any loss. Plaintiffs were prepared to market the property and prevent a slide in the the property's value related to material deterioration from its vacancy and neglect. The only Realtor ever involved was abused and she had produced a full cash, appraised value unconditional offer to purchase.

3

10.     From the time it took possession of the property, neither Hudson nor CitiMortgage made any effort to repair or to maintain the property, to market the property, or to delegate to any entity including plaintiffs the job of mitigation, by steps of preservation, inspection, and then valuing the property related to offering it for sale.   CitiMortgage's counter-intuitive instructions were to stop all effort to sell the property.

11.     In 2015 plaintiffs assertively attempted to get a response from Hudson personnel who had been identified as those to alert about the general inattention, waste and deterioration.   Hudson never responded beyond an acknowledgment of the inquiry.

12.     Plaintiffs have now affirmatively addressed the necessity to act, under the facts above. Attached as Exhibit D is a deed in the real estate records completing the transfer of legal title to M & T Bank Corporation, following the *de facto* process which delivered equitable title.   Plaintiffs have granted to defendant first and paramount title, warranting it is without encumbrance and with no junior lien.   The property is now defendant's as collateral to liquidate, and restored to the taxable local base.

BREACH OF CONTRACT

13.     Paragraphs 1–12 are incorporated herein as if restated here word for word.

14.     Plaintiffs agreed with the Defendant's agent and assignor bank that they would take possession of the property, preserve and protect it for to balance of its possession, till the DIL was completed.   That agreement has been breached, the property is in disrepair, and will be necessarily marketed at less than its maximum given its present condition related to careless disregard.

15.     The acts and omissions of CitiMortgage and Hudson are chargeable and assigned to defendant.

16.     Plaintiffs have performed as agreed in cooperating with and delivering paramount and merchantable to Hudson, free of lien or other cloud to title.

17.     Defendant is liable for the servicing agent CitiMortgage and assignor Hudson's actions and omissions.  It is necessary non-delegable public policy that investors and speculators preserve the integrity of a neighborhood from waste and disrepair, and the property tax base of the county. The deed attached should be declared accepted, so that Defendant assume the indicia of bare legal ownership until the property is liquidated as an asset of an investor bank.  Defendant is responsible for damages to plaintiffs by way of disgorgement of any claim by defendant for accrued interest and costs, if not recovered in defendant's liquidation of the collateral.

<u>PROMISSORY ESTOPPEL</u>

18.     Paragraphs 1–17 are incorporated herein as if restated here word for word.

19.     CitiMortgage promised to Plaintiffs that it would maintain the property if Plaintiffs followed its instructions for preparing and then vacating the property.   It ordered plaintiffs to stop any effort at mitigation.  Plaintiffs relied upon those express and implied responsibilities assumed Defendant's agent and assignor should have reasonably expected Plaintiffs to rely on those promises.

20.     CitiMortgage was, at all times relevant, acting as an agent for Hudson Bank, whose responsibility to plaintiffs is now that of the defendant.

21.     In the event defendant liquidates the property hereafter at a price less than an amount it claims is in arrearage, a declaration of rights under the agreements as Exhibit A and B should issue finding that defendant is estopped from and has waived its right to assert any deficiency against the plaintiffs, both as is the industry practice in a DIL transaction, as well as from the inattention to the property by the predecessor in title Hudson and the servicing agent.

5

## EQUITABLE ESTOPPEL

22.    Paragraphs 1–21 are incorporated herein as if restated here word for word.

23.    CitiMortgage and Hudson Bank knew or should have known that the dispute concerning the servicing agreement, and the inattention to the Hudson inventory as a result of the pending sale to defendant, would result in a lack of care of property being exercised by servicing agent CitiMortgage and Hudson.

24.    Plaintiffs were ignorant of the underlying cause of the inefficient and duplicative process purported to be the DIL process of CitiMortgage and its principals.   Plaintiffs relied to their detriment on Hudson and CitiMortgage's conduct in requiring they vacate the property, not knowing the property would be abandoned by defendant's predecessor and agent.

25.    Judgment should be entered for Plaintiffs declaring that Defendants are estopped from asserting any deficiency resulting from the actions and inactions of Defendants, as Plaintiffs reasonably relied upon the actions of Defendants in forbearing any continued maintenance and upkeep of the property.

26.    A judgment should be entered that the defendant is deemed to have accepted the deed transferring the title to the property to M & T Bank.

## ACCORD AND SATISFACTION

27.    Paragraphs 1–26 are incorporated herein as if restated here word for word

28.    In providing good and marketable title to Defendants, Plaintiffs askd for judgment that they have fulfilled all obligations to Defendant, which accrue from the conduct of Hudson and CitiMortgage acting in every respect that it had no intent to either liquidate the property or otherwise proceed against the plaintiffs.

29.     Judgment should be rendered declaring that Defendant's contractual rights under Exhibits A and B are satisfied, the deed on the property is deemed accepted in full accord and satisfaction of all claims arising from the mortgage.

### JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

WHEREFORE, pray that this Court declare that Defendants have accepted the warranty deed and transfer of title is thus accomplished based upon notions of fair play, public policy, waiver, and estoppel; further, the court should declare that there is imposed a finding of an accord and satisfaction upon receipt of the warranty deed, and that any further action by defendant under the language of the contract and note, exhibit A and B, will not be permitted.

Respectfully submitted,

**Will Shelton, Esq.**
AR Bar No. 2011086
13608 Kanis Road
Little Rock, AR 72211
Phone: 501-223-3100
Fax: 501-223-3103
Email: will@tlf-arkansas.com

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2015-Dec-10  14:27:16
60CV-15-5212
C06D12 : 26 Pages

2014047112 Received: 8/14/2014 02:03:03 PM
Recorded: 08/14/2014 02:03:03 PM Filed & Pages
Recorded in Official Records of Larry Crane,
PULASKI COUNTY CIRCUIT/COUNTY CLERK
Fees $25.00

When Recorded Return To:
CT LIEN SOLUTIONS
PO BOX 29071
GLENDALE , CA 91209-9071
Phone #: 800-331-3282

Prepared By:
CITIMORTGAGE, INC
STARLA DODSON
1000 TECHNOLOGY DRIVE, MS 321
O'FALLON , MO 63368-2240



## ASSIGNMENT OF MORTGAGE

MERS SIS # 888-679-6377 MIN: 100039032108938719

NOW ALL MEN BY THESE PRESENTS:
FOR VALUE RECEIVED, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Mortgage Electronic Registration Systems, Inc. "(MERS)" as nominee for Quicken Loans Inc. its successors and assigns , ("Assignor"), hereby grants, sells, conveys, transfers and assigns to  Hudson City Savings Bank  ("Assignee") all of its right, title and interest in and to a certain Mortgage executed by Robert D. Trammell and M. Renee Trammell  to Mortgage Electronic Registration Systems, Inc. "(MERS)" as nominee for Quicken Loans Inc. its successors and assigns  in Book: NA Page: NA Instrument No: 2007024157 Register's Office for Pulaski County, Arkansas (the "Mortgage").

Description/Additional information: See Exhibit A

DATE: _____8-7-14_____

Mortgage Electronic Registration Systems, Inc. "(MERS)" as nominee for Quicken Loans Inc. its successors and assigns



By: Starla F. Dodson
Assistant Secretary

Page # 1  44408702 RPY Ref# 877256 24449 AR119 Pulaski Count Internal

Ex: 'A' - 1

STATE OF MISSOURI, ST. CHARLES COUNTY

On __8-7-14__ before me, the undersigned, a notary public in and for said state, personally appeared **Starla F. Dodson, Assistant Secretary** of **Mortgage Electronic Registration Systems, Inc. "(MERS)" as nominee for Quicken Loans Inc. its successors and assigns** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

SYBIL SHORT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: March 19, 2016
Commission Number: 12316670

Notary Public **Sybil Short**

Commission Expires: 03/19/2016

Page # 2   44408702 RPY Ref# 877256 24449 AR119 Pulaski Count Internal

# EXHIBIT A

A part of the Northeast Quarter, Southwest Quarter and a part of the Northwest Quarter, Southeast Quarter, Section 28, Township 2 North, Range 14 West, Pulaski County, Arkansas, more particularly described as follows:  Commence at the Southwest corner of said Northwest Quarter, Southeast Quarter; thence South 89 degrees 57 minutes West 257.86 feet to a point in the centerline of a 60 foot ingress-egress easement; thence along the centerline of a 60 foot ingress-egress easement the following:  North 04 degrees 27 minutes East 80.13 feet; thence North 78 degrees 32 minutes East 190.0 feet; thence North 08 degrees 28 minutes West 264.9 feet to the point of beginning; thence continue North 08 degrees 28 minutes West along centerline of 60 foot ingress-egress easement 215.1 feet; thence North 31 degrees 02 minutes east along said centerline of 60 foot ingress-egress easement 380.0 feet to a point in the centerline of Denny Road; thence along the centerline of Denny Road the following: South 58 degrees 58 minutes East 106.97 feet; South 58 degrees 54 minutes East 275.22 feet; South 57 degrees 47 minutes East 78.8 feet; thence leaving centerline South 14 degrees 12 minutes West 337.4 feet; thence South 28 degrees 23 minutes West 194.3 feet; thence North 87 degrees 19 minutes West 109.2 feet; thence North 57 degrees 45 minutes West 195.1 feet; thence North 50 degrees 29 minutes West 141.3 feet to the point of beginning (with the West 30 feet subject to an ingress-egress easement and the North 30 feet for the right of way for Denny Road)

0702-202

RETURN TO FIRST NATIONAL TITLE
4001 RODNEY PARHAM ROAD
BUILDING ONE, SUITE 101
LITTLE ROCK, AR 72212

2007   4157
03/28/20.   01:37:18 PM
Filed & Recorded in
Official Records of
PAT O'BRIEN
PULASKI COUNTY
CIRCUIT/COUNTY CLERK
Fees $53.00

Return To:
Christie Holloway
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI  48152

Prepared By:
Erica Palmer
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI  48152



──────────────[Space Above This Line For Recording Data]────────────── 3871

# MORTGAGE

MIN 100039032108938719

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated     March 22, 2007
together with all Riders to this document.

(B) **"Borrower"** is Robert D. Trammell, and M. Renee Trammell, husband and wife

Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is  Quicken Loans Inc.

Lender is a                                   Corporation
organized and existing under the laws of              the State of Michigan
Lender's address is 20555 Victor Parkway, Livonia, MI  48152

ARKANSAS-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**        Form 3004  1/01
1392727079

VMP -6A(AR) (0306)

Page 1 of 15                      Initials:

VMP Mortgage Solutions (800)521-7291

*Ex: 'A'-2*

▮▮▮3871

**(E) "Note"** means the promissory note signed by Borrower and dated ____ March 22, 2007 ____ .
The Note states that Borrower owes Lender One Million and 00/100

Dollars

(U.S. $1,000,000.00 ____ ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than ____ April 1, 2037 ____ .

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider         ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider    ☒ Other(s) [specify]
                                                        Legal Attached

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

VMP ®-6A(AR) (0308)                    Page 2 of 15                    Initials ____    Form 3004   1/01

3871

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
County           of           Pulaski           :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Parcel ID Number:          53R0280002501                which currently has the address of
22021 Denny Rd                                                         [Street]
              Little Rock                    [City], Arkansas 72223          [Zip Code]
("Property Address"):
    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

VMP-6A(AR) (0308)                    Page 3 of 15                              Form 3004   1/01

**3871**

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts





3871

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

VMP®-6A(AR) (0304)            Page 5 of 15            Initials: ___            Form 3004   1/01

3871

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

3871

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

VMP® -6A(AR) (0308)          Page 7 of 15          Initials _____          Form 3004   1/01

3871

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

VMP -6A(AR) (0308)                    Page 8 of 15                    Form 3004   1/01

3871

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6A(AR) (0308)          Page 9 of 15          Initials: _____          Form 3004   1/01

3871

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

3871

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

███████3871

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _____

Form 3004   1/01

████3871

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

It is understood and agreed to by Borrower that this Security Instrument is subject to the foreclosure procedures of the Arkansas Statutory Foreclosure Law, Act 53 of 1987, as amended from time to time (the "Act"), for Borrower's breach of any covenant or agreement in this Security Instrument. In furtherance and not in limitation of the provisions of Section 12, any forbearance by Lender in exercising any right or remedy under the Act shall not be a waiver of or preclude acceleration and the exercise of any right or remedy under the Act, or at the option of Lender, use of judicial foreclosure proceedings.

23. Release. Upon payment in full of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

3871

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

Robert D. Trammell  03/22/2007 (Seal)
-Borrower

M. Renee Trammell  03/22/2007 (Seal)
-Borrower

_____ (Seal)          _____ (Seal)
-Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                        -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                        -Borrower

VMP -6A(AR) (0308)          Page 14 of 18          Form 3004  1/01

███3871
**STATE OF ARKANSAS,**                Pulaski            **County ss:**

    On this the   22nd   **day of**    March, 2007     , before me, the undersigned officer, personally appeared Robert O. Trammell, and M. Renee Trammell, husband and wife

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/(they) executed the same for the purposes therein contained.

    In witness whereof I hereunto set my hand and official seal.

My Commission Expires:
7/04/2011

                       Notary Public      Janice Clayton

Lien Holder: Quicken Loans Inc.

Address: 20555 Victor Parkway
          Livonia, MI 48152
Telephone Number: 1-800-466-6480

OFFICIAL SEAL
**JANICE CLAYTON**
NOTARY PUBLIC-ARKANSAS
PULASKI COUNTY
My Commission Expires 7-4-2011

Contact Christie Holloway

                for release of lien.

VMP -6A(AR) (0308)                    Page 15 of 15        Initials            Form 3004   1/01

Doc   2007024157

### "EXHIBIT A"

A part of the Northeast Quarter, Southwest Quarter and a part of the Northwest Quarter, Southeast Quarter, Section 28, Township 2 North, Range 14 West, Pulaski County, Arkansas, more particularly described as follows:  Commence at the Southwest corner of said Northwest Quarter, Southeast Quarter; thence South 89 degrees 57 minutes West 257.86 feet to a point in the centerline of a 60 foot ingress-egress easement; thence along the centerline of a 60 foot ingress-egress easement the following:  North 04 degrees 27 minutes East 80.13 feet; thence North 78 degrees 32 minutes East 190.0 feet; thence North 08 degrees 28 minutes West 264.9 feet to the point of beginning; thence continue North 08 degrees 28 minutes West along centerline of 60 foot ingress-egress easement 215.1 feet; thence North 31 degrees 02 minutes east along said centerline of 60 foot ingress-egress easement 380.0 feet to a point in the centerline of Denny Road; thence along the centerline of Denny Road the following: South 58 degrees 58 minutes East 106.97 feet; South 58 degrees 54 minutes East 275.22 feet; South 57 degrees 47 minutes East 78.8 feet; thence leaving centerline South 14 degrees 12 minutes West 337.4 feet; thence South 28 degrees 23 minutes West 194.3 feet; thence North 87 degrees 19 minutes West 109.2 feet; thence North 57 degrees 45 minutes West 195.1 feet; thence North 50 degrees 29 minutes West 141.3 feet to the point of beginning (with the West 30 feet subject to an ingress-egress easement and the North 30 feet for the right of way for Denny Road)

File No.:  0702-202-JC

MERS MIN: 100039032108938719

# InterestFirst℠ NOTE

Trammell, Robert      3871

March 22, 2007
[Date]

Little Rock
[City]

AR
[State]

22021 Denny Rd
Little Rock, AR 72223
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $1,000,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  Quicken Loans Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.750 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month. This payment will be for interest only for the first      120      months, and then will consist of principal and interest.

I will make my monthly payment on the      1st      day of each month beginning on      May 1, 2007      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on      April 1, 2037      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 553154, Detroit, MI  48255-3154

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 5,625.00      for the first      120      months of this Note, and thereafter will be in the amount of U.S. $ 7,603.65      . The Note Holder will notify me prior to the date of change in monthly payment.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment

MULTISTATE InterestFirst FIXED RATE NOTE-Single Family-Fannie Mae UNIFORM INSTRUMENT

1392727068

-835N (0210)      Form 3271 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3      Initials:

Ex: 'B'

unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Form 3271 1/01

Initials:

**M&T** Bank  P.O. Box 61906.
Dallas, TX 75261-9063

November 30, 2015

Ազֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈֈ
4-750-03499-0002815-001-01-000-000-000-000

 ROBERT D TRAMMELL
M R TRAMMELL
22021 DENNY RD
LITTLE ROCK AR  72223-9277

<span style="writing-mode: vertical-rl">750-2044-0115F</span>

Re: Notification of Sale or Transfer of Mortgage Loan
   Mortgage Account: ████5479
   Property Address:  22021 DENNY RD LITTLE ROCK  AR 72223

Federal law requires us to notify you that the mortgage loan referenced above has been assigned or otherwise transferred to M&T Bank. We are the new creditor of your mortgage loan.

Mortgage Loan Information:
Date of Loan:  03/22/2007
Original Amount of Loan:  $1,000,000

Please note the following information regarding the sale/transfer of your mortgage loan:

1.   The name, address and telephone number of the new creditor:

          M&T Bank
          One M&T Plaza
          Buffalo, NY 14203
          Ph: (800) 724-2224
          www.mtb.com

2.   The date of the transfer of your mortgage loan: 11/1/2015.

3.   How to reach an agent or party having authority to act on behalf of the new creditor:

          CitiMortgage, Inc.
          P.O. Box 6243
          Sioux Falls SD 57117
          Ph: 1-800-283-7918

4.   The instrument representing the indebtedness of your mortgage loan (promissory note) is not a recordable document, but it is in our possession or held on our behalf by our custodian. The security instrument (mortgage or deed of trust) that secures  the repayment of your promissory note is, however, recorded in the public land records for  PULASKI, AR.  Transfer of ownership instruments (assignments) have not been  recorded in public records as of the date of this notice.



5.  Additional Information:

This Notice does not change the address where you send your mortgage loan payments. Please use the following address when making mortgage loan payments:



> CitiMortgage, Inc.
> P.O. Box 78015
> Phoenix AZ 85062

If there is a change in the address for your mortgage loan payments, you will be notified of such changes separately and apart from this notice.

Partial Payments:
Your lender

\_\_\_\_\_   May accept payments that are less than the full amount due (partial payments) and apply them to your loan.
XXX   May hold them in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.
\_\_\_\_\_   Does not accept partial payments.

If this loan is sold, your new lender may have a different policy.

If you are in bankruptcy or received a bankruptcy discharge of debt, this communication is not an attempt to collect the debt against you personally, but is strictly for informational purposes only.





2015076930

PRESENTED: 12-09-2015 11:13:03 AM    RECORDED: 12-09-2015 11:33:13 AM

In Official Records of Larry Crane Circuit/County Clerk

## QUITCLAIM DEED   PULASKI CO, AR FEE $25.00

### KNOWN ALL MEN BY THESE PRESENTS:

That we, Robert D. Trammell and Margaret Renee Trammell, husband and wife, Grantors,

for and in consideration of the sum of One and no/100 dollars, in hand paid by M&T Bank

Corporation, Grantee, the receipt of which is hereby acknowledged, do hereby grant, bargain, sell,

convey, and gift unto the said Grantee and unto its heirs and assigns forever, the following lands

lying in Pulaski County, Arkansas:

### See attached Exhibit A

To have and to hold the same unto the said Grantee and unto its heirs and assigns forever,

with all appurtenances thereunto belonging.

WITNESS our hands and seals on this _8th_ day of December, 2015.

_Robert D. Trammell_                    _Margaret Renee Trammell_

**Robert D. Trammell,**                 **Margaret Renee Trammell,**
*Grantor*                               *Grantor*

### ACKNOWLEDGMENT

**STATE OF ARKANSAS**

**COUNTY OF PULASKI**

This day personally appeared before me, the undersigned, duly commissioned, qualified
and acting Notary Public within and for said County and State, the within named Margaret Renee
Trammell, and Robert D. Trammell, husband and wife, Grantors in the foregoing Instrument, and
acknowledged that they signed, executed and delivered the same on the day and year therein
mentioned for the uses, purposes and considerations therein mentioned and set forth.

WITNESS MY HAND AND NOTORIAL SEAL THIS _8th_ DAY OF
DECEMBER, 2015.

1

*Ex: "D" - 1*

(SEAL)

_____
Notary Public

My commission expires: 7-01-25

```
OFFICIAL SEAL - #12694721
DAVID A. MOORE
NOTARY PUBLIC-ARKANSAS
PULASKI COUNTY
MY COMMISSION EXPIRES: 07-01-25
```

This instrument prepared at the instruction of the Grantors.  I certify under penalty of false swearing that at lease the legally correct amount of documentary stamps have been placed on the instrument.  Exempt consideration paid if none shown.

_____
**Robert D. Trammell**
*Grantor*

_____
**Margaret Renee Trammell**
*Grantor*

Prepared by:
Will Shelton, Esq.
13608 Kanis Rd
Little Rock, AR 72211
(501) 223-3100

2.        Ex: D-2

# EXHIBIT A

A part of the Northeast Quarter, Southwest Quarter and a part of the Northwest Quarter, Southeast Quarter, Section 28, Township 2 North, Range 14 West, Pulaski County, Arkansas, more particularly described as follows:  Commence at the Southwest corner of said Northwest Quarter, Southeast Quarter; thence South 89 degrees 57 minutes West 257.86 feet to a point in the centerline of a 60 foot ingress-egress easement; thence along the centerline of a 60 foot ingress-egress easement the following:  North 04 degrees 27 minutes East 80.13 feet; thence North 78 degrees 32 minutes East 190.0 feet; thence North 08 degrees 28 minutes West 264.9 feet to the point of beginning; thence continue North 08 degrees 28 minutes West along centerline of 60 foot ingress-egress easement 215.1 feet; thence North 31 degrees 02 minutes east along said centerline of 60 foot ingress-egress easement 380.0 feet to a point in the centerline of Denny Road; thence along the centerline of Denny Road the following: South 58 degrees 58 minutes East 106.97 feet; South 58 degrees 54 minutes East 275.22 feet; South 57 degrees 47 minutes East 78.8 feet; thence leaving centerline South 14 degrees 12 minutes West 337.4 feet; thence South 28 degrees 23 minutes West 194.3 feet; thence North 87 degrees 19 minutes West 109.2 feet; thence North 57 degrees 45 minutes West 195.1 feet; thence North 50 degrees 29 minutes West 141.3 feet to the point of beginning (with the West 30 feet subject to an ingress-egress easement and the North 30 feet for the right of way for Denny Road)

Ex: "D"- 3

~~Multiple claims.~~  If a complaint asserts multiple claims which involve different subject matter of the circuit court, the cover sheet for that division which is most definitive of the nature of the case should be selected and completed.

ELECTRONICALLY FILED
Pulaski County Circuit Court
Larry Crane, Circuit/County Clerk
2015-Dec-10  14:27:16
60CV-15-6127
C06D12 : 12 Pages

# COVER SHEET
# STATE OF ARKANSAS
# CIRCUIT COURT: CIVIL

The civil reporting form and the information contained herein shall not be admissible as evidence in any court proceeding or replace or supplement the filing and service of pleadings, orders, or other papers as required by law or Supreme Court Rule.  This form is required pursuant to Administrative Order Number 8.  Instructions are located on the back of the form.

## FILING INFORMATION

County: _____    District: _____    Docket Number: CV _____

Judge: _____    Division: _____    Filing Date: _____

Plaintiff: _____    Defendant: _____

Attorney Providing Information: _____    _____
□ Plaintiff      □ Defendant    □ Intervenor      Address

Litigant, if Pro Se: _____    _____
                                                Address
Related Case(s): Judge_____    Case Number(s) _____

**Type of Case:**

*Torts*
- □ (NM) Negligence: Motor Vehicle
- □ (NO) Negligence: Other
- □ (BF) Bad Faith
- □ (FR) Fraud
- □ (MP) Malpractice
- □ (PL) Product Liability
- □ (OD) Other _____

*Contracts*
- □ (IS)  Insurance
- □ (DO) Debt: Open Account
- □ (PN) Debt: Promissory Note
- □ (EM) Employment
- □ (OC) Other _____

*Equity*
- □ (FC) Foreclosure
- □ (QT) Quiet Title
- □ (IJ)  Injunction
- □ (PT) Partition
- □ (OT) Other _____

*Miscellaneous*
- □ (CD) Condemnation
- □ (RE) Replevin
- □ (DJ) Declaratory Judgment
- □ (UD) Unlawful Detainer
- □ (IN) Incorporation
- □ (EL) Election
- □ (FJ) Foreign Judgment
- □ (WT) Writs_____
- □ (AA) Administrative Appeal
- □ (CF) Property Forfeiture
- □ (RD) Remove Disabilities
- □ (NC) Name Change
- □ (OM) Other _____

**Jury Trial Requested:** □ Yes □ No      **Manner of Filing:**  □ Original □ Re-open □ Transfer
                                          □ Return from Federal/Bankruptcy Court

## DISPOSITION INFORMATION

Disposition Date: _____    □ Bench Trial    □ Non-Trial    □ Jury Trial

**Judgment Type:**
- □ (DJ) Default Judgment
- □ (SJ) Summary Judgment
- □ (CJ) Consent Judgment
- □ (TJ) Trial Judgment
- □ (OJ) Other Judgment
- □ (PG) Petition Granted
- □ (PD) Petition Denied
- □ (DF) Decree of Foreclosure

**Dismissal Type:**
- □ (DW) Dismissed with Prejudice
- □ (DN) Dismissed without Prejudice

**Other:**
- □ (TR) Transferred to Another Jurisdiction
- □ (RB) Removed to Bankruptcy Court
- □ (RF) Removed to Federal Court
- □ (AR) Arbitration

**Judgment For:**
□ Plaintiff    □ Defendant    □ Both      Judgment Amount: $ _____

Clerk's Signature _____    Date _____
AOC 23  10-01
625 Marshall Street
Little Rock, AR 72201

Send 1 paper or electronic copy to AOC upon filing.
Send 1 paper or electronic copy to AOC upon disposition.
Keep original in court file.

**Effective 1-1-2002**